IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MYRTLE GORDON, : | | |
|         Plaintiff, : | | |
| : | | |
| v. : | CIVIL ACTION | |
| : | | |
| CITY OF PHILADELPHIA, ET AL., : | NO.  07-5039 | |
|         Defendants. : | | |
| : | | |
| : | | |

<u>**MEMORANDUM AND ORDER**</u>

**Tucker, J.**                                                                                          **August \_\_\_, 2009**

      Following a bench trial in this matter on August 3, 2009, and pursuant to Rule 52 (a) of the Federal Rules of Civil Procedure, the Court makes the following Findings of Fact:

      1.      This is an action for damages in connection with the demolition of real property owned by Plaintiff, Myrtle Gordon, located at 3442 N. 16th Street, Philadelphia, Pennsylvania (hereinafter "the Property").

      2.      This action was brought pursuant to 42 U.S.C. § 1983 against Defendant City of Philadelphia (hereinafter "the City") for violation of Plaintiff's due process rights under the 4th and 14th Amendments.  In addition, Plaintiff's suit alleges negligence, breach of contract and unjust enrichment against Defendants Garry Flowers (hereinafter "Flowers"), and GMF Interior Installations[1] (hereinafter "GMF").  In Plaintiff's initial Complaint, filed in the Court of Common Pleas Philadelphia County, she also sued Defendant JPC Group, Inc. (hereinafter "JPC").  Plaintiff, subsequently, filed an Amended Complaint in this Court (Doc. 21) withdrawing JPC as a Defendant in this action.

---

    [1] Owned and operated by Defendant Garry M. Flowers.  Though Defendants Flowers and GMF have been sued in this action under various theories the Parties have been unable to locate Flowers or get his participation in these proceedings, his deposition testimony notwithstanding.

3. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(1), (3), and (4).

4. The evidence introduced at trial established that, on or about April 27, 2006, Plaintiff, her now deceased husband,[2] and her son, Jermaine Davis, purchased the Property in dispute for the price of $31,421.  It is well settled that Plaintiff's ownership interest in real property is constitutionally protected by due process of law.  See, e.g., United States v. James Daniel Good Real Property, 510 U.S. 43, 49 (1993).

5. Plaintiff's intention was to rehabilitate the Property and gain future rental income from it.

6. At the time the Property was purchased it was subject to a number of License and Inspection ("L&I") violations and had been designated by the City as "Unsafe."  Plaintiff was given a violation notice from the City, dated August 15, 2005, by her realtor when she purchased the Property.  This notice indicated that Robert Shackleford–the previous owner of the property–needed to make the necessary repairs in order to remove the "Unsafe" designation.  The notice further stated that if the Property owner did not take the necessary action the City *could* demolish *or* repair the structure and bill the Property owner for the costs.[3]

---

[2] Plaintiff's husband died a few months after the Property was purchased on August 8, 2006.

[3] Specifically each of the notices at issue stated that the "Unsafe" designation would "remain until the violation(s) below is corrected and the structure is made safe and secure or is taken down and the debris is properly removed."  The notices further stated that if the Property owner failed to comply with the order "the City *may* eliminate unsafe condition(s) by repair *or* demolition using its own forces or by contract" and that "the owner will be billed for all costs incurred...." Def.'s Ex. 2 (emphasis added). Accordingly, from the time that Plaintiff purchased the Property on April 27, 2006, until the time that the Property was demolished, in August of 2007, there were three options for remedying the Property's "Unsafe" designation: 1) Plaintiff could remedy the L&I violations by either making the necessary repairs herself or hiring a contractor to do so; 2) the City could make the necessary repairs and bill Plaintiff for the cost of doing so; or 3) the City could demolish the Property and bill the Plaintiff for the cost doing so.

7.	The notice did not give Plaintiff a specific or direct indication of the City's intention to demolish the Property.  Moreover, the notice did not specify a time limit as to when the Property owner had to apply for a building permit necessary to complete the repairs, or give a time frame as to when the repairs had to be completed by in order to avoid any further action by the City.  Most importantly, these notices did not indicate a date on which the City itself would either take steps to repair or demolish the Property.

8.	After purchasing the Property, on or about January 28, 2007, Plaintiff and her son, Alvin Bowser, entered into a contract with GMF for "all major work only as per L&I violation notice."  Pl.'s Ex. 3.  The contract estimated that the work would be completed within sixty days.  Plaintiff paid GMF, up front, the full contract price of $56,666 to start and complete the necessary repairs.

9.	GMF began work on the Property, but did so without obtaining a building permit.  Plaintiff, was unaware that GMF had commenced work on the Property without the requisite permit until Plaintiff received a phone call of said fact.  GMF stopped work on the Property in late February or early March of 2007, and on April 24, 2007, Flowers–through a company that GMF outsourced the responsibility to–filed an application for a building alteration permit with the City.

10.	The application remained pending with L&I for approximately four months, during which time the City continued to send out notices indicating the Property was in an "Unsafe"condition and that failure to make the necessary repairs could result in repair or demolition by the City with the owner being billed for the same.

11.	Plaintiff was unaware of the notices sent by the City–aside from the notice she

was given directly by her realtor when she purchased the Property– and that the City was, or should have been, aware that Plaintiff was not in receipt of the mailed notices.

12. Plaintiff was not listed by the City as the primary owner of the Property. Instead, the City listed Robert Shackleford as the primary owner and, as such, sent notices to him. Pl.'s Ex. 12.

13. The City has been unable to produce any return receipts indicating that Plaintiff actually received any of the notices it purportedly mailed to her after she purchased the Property in 2006.

14. Furthermore, the notices the City sent were "returned not deliverable as addressed," Pl.'s Ex. 14, and the City had to repeatedly "notice the Property" with each and every occasion resulting in no response from Plaintiff, no return receipt, and/or a returned notice letter with an undeliverable status.

15. In early August of 2007 Plaintiff contacted the City and inquired with L&I as to the delay in the building permit application. Plaintiff was told by Brett Martin, a city code official, that if Flowers came into the office for two hours and explained the blueprints, the permit application would be approved on the spot. Plaintiff relayed this information to Flowers, who later went into the City offices to explain the blueprints.

16. On August 29, 2007, the application for a building permit was approved when Brett Martin permitted the original application to be converted from a building alteration for renovation into a "building permit alterations to capture the ID [inherently dangerous] condition," Martin Dep. 38: 10-11, June 11, 2009, which would allow GMF to make the repairs necessary to remedy the L&I violations.

17.     The building permit afforded the contractor six months to commence working on the project.

18.     When Plaintiff spoke directly to Mr. Martin in L&I about the pendency of Flowers' delayed building permit application in early August of 2007, she was given no indication by him or anyone else that her Property would soon be demolished.  Rather, from the time Plaintiff contracted with GMF in January of 2007 through August of 2007, Plaintiff was under the distinct impression that she was actively taking the necessary steps to be in compliance with the one notice she had seen regarding repairing the L&I violations and removing the "Unsafe" designation.

19.     On August 17, 2007, the Property was given a heightened designation by the City, which moved the Property from an "Unsafe" case to a "Dangerous" one.  The City's decision to heighten the Property's designation was largely due to two factors.  First, the notices the City sent to Plaintiff in regards to the Property went unanswered and were returned as unserviceable.  Second, when GMF stopped work on the Property the rear wall of the property had been removed, leaving the Property exposed.

20.     Given this heightened designation, the Chief of Contractual Services ordered the Property subject to a curb side bid, which means demolition on the property must start after three hours from the time a demolition company is awarded the bid.

21.     A bid was awarded to JPC on August 17, 2007, to demolish the Property.  The Property was demolished sometime shortly thereafter in August of 2007.  The exact date and time of the demolition is unknown, but when Plaintiff returned to her home from a trip down south in early September of 2007, she found it demolished.

22.     There was significant confusion, lack of communication and lack of coordination amongst the different divisions within the City's L&I offices. As regards the building alteration permit application, the City did not put the application on hold, deem it abandoned, or reject it.

23.     Furthermore, while one division of L&I was processing Flowers' pending application for a building alteration permit, the Contractual Services division was busy making plans to demolish Plaintiff's Property.

24.     There is a significant disconnect in L&I that requires remedy where one division can allow a permit to sit for several months with no decision being made on it, fail to communicate with the permit filer regarding any issues possibly delaying the application, only to subsequently issue a building permit for the Property, to then have the parties discover that the Property was demolished by the Contractual Services division nearly two weeks earlier.

25.     As pertains specifically to Defendants GMF and Flowers, the Court concludes Flowers had the primary responsibility to apply for a permit and failed to do so in a timely manner. Flowers also failed to complete the work within the contracted sixty (60) days.

26.     Finally, Flowers failed to secure the house in a condition to prevent vandalism and insure the safety of the building and neighborhood, which caused L&I to change the Property's designation.

Pursuant to Rule 52 (a) of the Federal Rules of Civil Procedure, the Court makes the following Conclusions of Law:

1.      Due Process, under the 14th Amendment, requires that the government provide a property owner "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their

objections." Jones v. Flowers, 126 S.Ct. 1708, 1713-14 (2006) (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)). Notice is constitutionally sufficient where it is reasonably calculated to reach the intended recipient when it is sent. See Mullane, 339 U.S. at 314.

      2.      As pertains to the City's mailed notices, it is well established that where the government has knowledge that notice pursuant to its normal procedures has been ineffective, an obligation is triggered on the government's part to take additional steps to effectuate notice. See Jones, 126 S.Ct. at1716 (requiring the government to "consider unique information about an intended recipient regardless of whether a statutory scheme is reasonably calculated to provide notice in the ordinary case."). Thus, when a mailed notice is returned to the government as unclaimed, where practicable, the government must take additional steps to attempt to provide notice to a property owner before disposing of their property. See id. at 1713 (2006) (applying this principle to a notice of tax sale sent by the state of Arkansas).

      3.      Applying the principles of *Jones* and *Mullane* and their progeny here, once the City gave Plaintiff's Property a heightened designation and made a decision to demolish it, the City did not give adequate notice to the Plaintiff regarding its decision nor provide her with an opportunity to be heard. The City's actions in this regard are in direct contravention to the Due Process Clause of the 14th Amendment requiring notice that the City had made a decision to demolish her Property, and an opportunity to be heard to contest this determination.

      4.      A three hour window for demolition of a property does not comport with the constitutional mandates of due process. Indeed, the posting of a "Danger" notice on the Property on August 17, 2007, was wholly ineffective and insufficient for two reasons. First, it was evident

that Plaintiff, nor anyone else, actually lived at the Property at which the "Danger" notice was posted.[4]  Second, the notice simply read "[y]our house is in violation of PM Code 307 or 308. You must contact the district office *to make repairs* . *If you fail to make repairs*, the City will *either* repair it *or* demolish the building...."  Def.'s Ex. 6 (emphasis added).

5.  Hence, a plain reading of the "Danger" notice posted on the Property just prior to demolition makes it evident that, even a*fter* a decision had already been made to demolish Plaintiff's Property within three hours, the City still failed to provide a notice to Plaintiff–either directly or on her Property–that specifically stated said fact.

6.  As such, the three hour time frame the City provided for demolition after it made a final determination to demolish the Property makes the City's actions virtually impossible to reconcile with the due process mandates of notice and opportunity to be heard.  This is particularly true where the City had knowledge of the fact that its attempts at noticing the Plaintiff had all failed.  See Jones, 126 S.Ct. at 1714 ("when the government learns its attempt at notice has failed, due process requires the government to do something more before real property may be sold....").

7.  Given the totality of circumstances, the City had an affirmative obligation to take further steps to effectuate notice to Plaintiff.

8.  To prevail against the City, Plaintiff must demonstrate that her constitutional rights have been violated as a result of a municipal "custom" or "policy."  Monell v. New York City Dept. of Soc. Svcs., 436 U.S. 658, 694-95.  The City's demolition decision and its execution

---

[4] This is a fact that the City was, or should have been, aware of given it was the City who designated the Property as unsafe for habitation and had sent field agents to make several visits to the Property throughout the relevant time frame to check on its status.

were made in accordance with apparent City "custom" or "policy," allowing the City to make a decision to demolish, and then within hours to solicit bids from contractors for demolition, and have the contractor demolish the property within three hours of acceptance of the bid. This "custom" is in direct contravention to the written policies and procedures in the Philadelphia Administrative Code, outlining the steps and time frames the City must abide by when it decides to demolish a citizens property.

9. The Court is not persuaded by the City's contention that Plaintiff had general and inquiry notice that the City could demolish her Property. Indeed, the City's argument in this regard is analogous to the position presented and rejected by the *Jones* Court.

10. In *Jones* the Court reasoned that "the common knowledge that property may become subject to government taking when taxes are not paid does not excuse the government from complying with its constitutional obligation of notice before taking private property." Jones, 126 S.Ct. at 1717; see also Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 800 (1983) ("knowledge of delinquency in the payment of taxes is not equivalent to notice that a tax sale is pending.").

11. The City's notices should have stated clearly and unequivocally exactly what action the City intended to take and on what date it intended to take such action.[5]

12. The Court concludes that Plaintiff is entitled to judgment in her favor and against Defendants.

13. The Court finds that Plaintiff is not liable for the costs of demolition, and that the

---

[5] By failing to do so, Plaintiff was left to assume from the one notice she did see that she *was* in compliance with the City's order and that, even if she weren't compliant, demolition by the City was only one possible option.

City is liable to Plaintiff for the value of the Property on the date she purchased it–$31,421.

14.  Defendants Flowers and GMF are liable in damages to the Plaintiff for the full contract price of $56,666.

15.  No prejudgment interest will be awarded.

An appropriate order follows.